*Harold A. Logan, Trustee Under the Harold A. Logan Trust Agreement Dated April 30, 2007 v. Wesley J. Dietz, et al.*, No. 1761, September Term, 2021. Opinion by Getty, Joseph M., J.

**HEADNOTES:**

MARYLAND HOMEOWNERS ASSOCIATION ACT – DEFINITION OF HOMEOWNERS ASSOCIATION

The Maryland Homeowners Association Act ("HOA Act"), codified at Md. Code (1974, 2015 Repl. Vol., 2022 Supp.) Real Prop. ("RP") § 11B-101, *et seq.*, defines "homeowners association" as "a person having the authority to enforce the provisions of a declaration." RP § 11B-101(i)(1). "Person" is defined in Title 1 of the Real Property Article, and its use in the context of the HOA Act refers to an entity or organization that operates as a homeowners association. A homeowner in an individual capacity cannot be a "homeowners association."

MARYLAND HOMEOWNERS ASSOCIATION ACT – DEFINITION OF DECLARATION – MANDATORY FEE

Under the HOA Act, a declaration is a recorded instrument that "creates the authority for a homeowners association to impose . . . [a] mandatory fee[.]" RP § 11B-101(d)(1). A mandatory fee is a fee that the homeowners anticipate being assessed at regular intervals (e.g., monthly, quarterly, or annually) to support the costs for maintaining the common use facilities of a development. The requirement to share maintenance costs under a pro rata share in a declaration of common use and maintenance obligations is not a "mandatory fee."

MARYLAND HOMEOWNERS ASSOCIATION ACT – AMENDMENT OF GOVERNING DOCUMENTS

RP § 11B-116(c) allows "a homeowners association [to] amend [a] governing document by the affirmative vote of lot owners in good standing having at least 60% of the votes in the development[.]" This provision is available to a homeowners association as defined in the Act. If a development does not qualify as a homeowners association under the Act, it may not amend its declaration under this provision of the HOA Act.

Circuit Court for Worcester County
Case No. C-23-CV-20-000194

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1761

September Term, 2021

_____

HAROLD A. LOGAN,
TRUSTEE UNDER THE HAROLD A.
LOGAN TRUST AGREEMENT DATED
APRIL 30, 2007

v.

WESLEY J. DIETZ, ET AL.

_____

Reed,
Albright,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J.
_____

Filed: August 2, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

> "A growing number of homes in Maryland are located in common ownership communities ("COCs") – that is, condominiums, cooperatives and homeowners associations. COCs are designed to give homeowners control over services and amenities that might otherwise be provided (if at all) by local governments. However, these communities present unique problems and difficulties."
>
> *Final Report – Task Force on Common Ownership Communities*, December 31, 2006.[1]

In the mid-20th century, new forms of housing developments became popular within the real estate industry. Following national trends to broaden home ownership, real estate developers in Maryland adopted condominiums, cooperative housing, and developments governed by homeowners associations—collectively referred to as "common ownership communities"—to provide common use amenities and to establish design standards to control the land use and appearance within the community.

By the 1980s, conflicts and issues arose under these alternatives to traditional home ownership. In response, Governor Harry R. Hughes appointed a Governor's Commission on Condominiums, Cooperatives and Homeowners Associations ("Governor's Commission") in 1982. The Governor's Commission proposed legislation for the Maryland Homeowners Association Act ("HOA Act") in its 1985 and 1986 Final Reports. The General Assembly enacted the HOA Act in the 1987 legislative session with the

---

[1] Task Force on Common Ownership Cmtys., 2006 Final Report, at 7 (Dec. 31, 2006), https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/003000/003160/unrestricted/20066534e.pdf [https://perma.cc/CU97-V6HT].

passage of Senate Bill 96. 1987 Md. Laws ch. 321 (codified at Md. Code (1974, 2015 Repl. Vol., 2022 Supp.) Real Prop. ("RP") § 11B-101 *et. seq.*).

In 2005, the General Assembly again wrestled with the "unique problems and difficulties" associated with homeowners associations and passed Senate Bill 229 to create the Task Force on Common Ownership Communities. Task Force on Common Ownership Comtys., 2006 Final Report, at 7 (Dec. 31, 2006); 2005 Md. Laws ch. 469. One of the legislative recommendations of the Task Force was to allow a homeowners association to amend its declaration with less than unanimous consent. The legislature passed this provision as RP § 11B-116 of the HOA Act in 2008. 2008 Md. Laws ch. 145

In the case before this Court, an eight-unit townhouse community known as Captains Quarters Townhouses ("Captains Quarters") was constructed in Ocean City, Maryland in 1978. The developer filed a declaration containing covenants, conditions, restrictions, and easements that is recorded in the county land records (the "1978 Declaration"). The declaration includes provisions for areas and facilities of common use, exterior design restrictions unless prior written approval is received from all eight unit owners, and maintenance obligations for pro rata cost sharing amongst the eight unit owners. The declaration does not authorize a homeowners association or other governing body, nor does it authorize a mandatory fee.

When one unit owner made exterior alterations without prior written approval, a challenge was filed in the Circuit Court for Worcester County by a neighboring unit owner. During the course of litigation, five unit owners joined together to amend the 1978 Declaration with an amended declaration ("2021 Declaration") that asserted the authority

2

of a homeowners association under RP § 11B-116. The 2021 Declaration retroactively approved all prior alterations made by any of the unit owners.

Among other findings, the circuit court determined that, under the 1978 Declaration, a *de jure* or implied right existed for a homeowners association, that the one-eighth pro rata contribution for maintenance obligations qualified as a "mandatory fee," and that the 2021 Declaration controlled and thus required dismissal of the case.

The Appellant presents us with one question:

Whether the authority for a homeowners association under Title 11B of the Maryland Real Property Article must be specifically stated or can be imposed as a matter of right ("*de jure*") or implied.

In addition, the Appellees present the following question concerning the 2021 Declaration:

Did the Circuit Court err, as a matter of law, in granting the appellees' Motion for Summary Judgment on the ground that the Maryland Homeowners Association Act applies to the declaration at issue such that it could be amended by a vote of sixty percent of the units?

To resolve this dispute, we must determine whether there is a *de jure* or implied right to create a homeowners association under a declaration of common use and maintenance obligations, whether Captains Quarters has a qualifying declaration with a "mandatory fee" under the Act, and whether the 1978 Declaration could be amended under RP § 11B-116 of the HOA Act. For the reasons explained below, we conclude that Captains Quarters is not subject to the HOA Act, that there does not exist a *de jure* or implied right to create a homeowners association under a declaration of common use and maintenance obligations, that a pro rata contribution does not qualify as a "mandatory fee,"

3

and that the parties to the 2021 Declaration could not rely on RP § 11B-116 to amend the 1978 Declaration.  Accordingly, we shall vacate the judgment of the Circuit Court granting summary judgment in favor of Dietz and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

### A.     *The Parties to this Dispute*

The parties to this dispute are townhouse owners in Captains Quarters.  In the procedural posture of this appeal, the named Appellant is Harold A. Logan, Trustee under the Harold A. Logan Trust Agreement dated April 30, 2007 ("Logan").  Logan is the owner of Unit 631D in Captains Quarters.  The named Appellee is Wesley J. Dietz ("Dietz").  Dietz is the owner of Unit 631A in Captains Quarters.

Logan initially filed a complaint in the Circuit Court for Worcester County challenging exterior alterations that Dietz made to his unit.  Logan claimed that such alterations violated the restrictive covenants contained in the 1978 Declaration.  The remaining townhouse unit owners were added as defendants in an Amended Complaint filed by Logan after the circuit court "determined that [its] disposition of this matter may impact the interests of other Captain[]s Quarters Plat property owners," thus making the other owners necessary parties.

As the case progressed in the circuit court, owners of two units—Paul and Christine Hawkins (Unit 631G), and Jack Fyock and Shelly Rockwell (Unit 631H)—did not respond to the complaint and default was entered against them.  They are not parties to this appeal.

4

On this appeal, the Appellees in addition to Dietz are the owners of four of the remaining units in Captains Quarters. Of these, three of the unit owners are aligned with the position of Dietz—John M. McKinley and the Janis Ryan Revocable Trust through trustees John M. McKinley and Janis M. Ryan (Unit 631C), David A. Vestal and Megan M. Park (Unit 631E), and John M. Owens and Patricia L. Owens (Unit 631F).

However, the owners of the fourth unit—Judith and Edward Cochrane (Unit 631B)—have also cross-appealed the circuit court's entry of summary judgment. Although listed as defendants in the case, the Cochranes agree with Logan on this appeal, as they did at the hearing on the motion for summary judgment, that the 1978 Declaration could not be amended pursuant to Maryland's HOA Act.

For simplicity throughout this opinion, we will generally refer to the positions of Logan and the Cochranes as that of "Logan" and to the other Appellees' position as that of "Dietz." For example, we may attribute a filing to either Logan or Dietz despite it being filed by another unit owner since it generally aligns with the position of either named party.

### B.    *Captains Quarters and Recording the 1978 Declaration*

As the developer of Captains Quarters, Terry O. Martin recorded the development's plat, dated May 25, 1978, in the Land Records of Worcester County at Plat Book F.W.H. No. 59, folio 52. The next month, Martin filed a declaration containing covenants, conditions, restrictions, and easements, dated June 13, 1978, and recorded in the county land records at F.W.H. Liber No. 627, folio 356, *et seq.*

5

The 1978 Declaration contains six paragraphs of covenants and restrictions, which are introduced by a statement of the developer's intent:

> WHEREAS, although it is the owner[']s desire and intention to convey title to each of the eight (8) townhouse units as separate and distinct entities, it is his further intention that said individual units be subject to certain common easements, servitudes, covenants, restrictions, and conditions for the common benefit of the entire project and/or for the mutual use of abutting units, to the end that the aforesaid individual conveyances will be made subject to the same[.]

The Declaration continues with subsequent numbered paragraphs that outline the common use and maintenance obligations.

Paragraph 1 provides "that the pilings, concrete columns and beams supporting the first floor of the townhouse units, shall be used for the permanent support and maintenance of the entire project[;]" that no individual owner may remove or alter support structures; and that, should the structures need repair or reconstructing, each lot owner would be responsible for one-eighth of the total costs and expenses.

Paragraph 2 provides for the mutual use of the dumpster and dumpster pad.

Paragraph 3 deems the roof a common facility and requires that any repair or replacement be the joint expense of the eight unit owners.

Paragraph 4 allows for the mutual use of the parking, utility, and access easements, sewer sanitary lines, underground electric conduit, telephone and cable television lines, water lines, and the transformer and transformer pad. This paragraph also requires each unit owner to pay for one-eighth of the cost of any associated maintenance and repairs.

Paragraph 5 incorporates easements by plat reference and states "that the property . . . and the townhouses constructed thereon, shall be subject to all easements and rights of

6

way that are set forth on the plats" citing to the aforementioned recorded plat at Plat Book F.W.H. No. 59, folio 52.

Paragraph 6 of the 1978 Declaration contains the restrictions concerning exterior design, and these provisions are most relevant to the present underlying dispute:

> It is covenanted and agreed that any one unit owner shall not have the right to alter, modify or change the exterior walls of the building hereinbefore set forth, in any form or fashion, including, but not limited to, painting, without the express written consent of the remaining seven (7) unit owners. Nothing herein contained shall be construed as to prevent any unit owner from performing routine maintenance on their respective units, and/or the erection and maintenance of privacy screens on the east and west sides of the aforesaid townhouses at the ground level of each townhouse unit.

In short, Paragraph 6 requires that a unit owner receive written consent from the seven other units before making exterior changes to a unit.

The remainder of the 1978 Declaration concludes with paragraphs specifying that the easements and covenants "run with the land" and thus are binding upon and inure to the benefit of current and future owners. The final paragraph prior to the testimonium clause states that the original mortgagee joined in the declaration for the purpose of subordinating its mortgage to the provisions of the declaration.

C.    *The Current Dispute – Claim & Counterclaim*

In the summer of 2020, Dietz renovated the exterior of his townhouse unit without receiving the written consent from the seven remaining unit owners. Logan reacted by filing a complaint in the Circuit Court for Worcester County claiming that the exterior renovations completed by Dietz violated Paragraph 6 of the 1978 Declaration.

7

The following numbered paragraphs from the amended complaint detail the allegations regarding the exterior renovations by Dietz that Logan was challenging:

14. In June of 2020, Defendant Dietz, the owner of Unit 631A, altered the exterior walls of the building by removing the old exterior siding and installing new exterior siding on the exterior walls of Unit 631A. The new siding installed is different than the siding that is on the remaining seven (7) unit owners [sic].

15. In June of 2020, and continuing through July of 2020, Defendant Dietz further altered the exterior walls of Unit 631A by removing the exterior rear doors and installing new, far larger doors with window panels on both the first and second floors. The construction caused portions of the exterior wall on Unit 631A to be removed.

16. Continuing later in the Summer of 2020, Defendant Dietz further altered the exterior walls of Unit 631A by fixing to the southern wall of his unit two heating ventilation and air conditioning (HVAC) devices as well [as] installing a new exterior door. This construction caused significant alterations to the exterior walls by removing portions of the southern exterior wall, covering or removing siding from the southern exterior wall, drilling and/or screwing mounting devices to the southern exterior wall, installing and fixing plumbing and electric to support those [devices] to the southern exterior wall. The condition of the southern exterior wall is further described on the photographs attached hereto and incorporated herein as Exhibit 12.

17. Defendant Dietz made the aforementioned alterations to the exterior walls while being fully aware that he did not have the required consent of the other seven (7) unit owners.

Logan argued that these unapproved renovations completed by Dietz violated the covenant in Paragraph 6 of the 1978 Declaration that an "owner shall not have the right to alter, modify or change the exterior walls of the building hereinbefore set forth, in any form or fashion, including, but not limited to, painting, without the express written consent of the remaining seven (7) unit owners." Logan requested declaratory and injunctive relief to define the rights and obligations of the parties under the 1978 Declaration, enjoin Dietz

8

from further altering the exterior walls of the building, and direct Dietz to restore the exterior walls to their condition prior to the renovation.

In his answer to Logan's complaint, Dietz generally admitted that the alterations had been made but denied that the Declaration had been violated or that the Declaration had any remaining force and effect. Dietz also filed a counterclaim, arguing that certain provisions of the 1978 Declaration had been abandoned. Dietz alleged that, although Paragraph 3 of the 1978 Declaration required that the roof over the development be "the joint expense of all eight (8) unit owners[,]" this covenant had been abandoned because various unit owners had repaired or replaced the portion of the roof over their respective units without contribution from the others.

Dietz also responded that, although Paragraph 6 of the 1978 Declaration prohibited alteration to the exterior of the townhouses without the consent of all remaining owners, owners within the development had made many alterations over the years without the consent of the other owners. He asserted that "[i]t ha[d] become impossible to obtain siding materials that duplicate the color and design of the original siding, and [that] developments in heating, ventilation and air conditioning systems mandate[d] changes that [were] necessary to perform routine maintenance of the respective units and to maintain modern living standards."

In conclusion, Dietz requested that the court determine that Paragraphs 3 and 6 of the 1978 Declaration had been abandoned and were unenforceable and declare that he did not have to comply with Paragraph 6 regarding the alterations to the exterior of his townhouse.

9

**D.** *Dietz "Amends" the 1978 Declaration*

After the original complaint and counterclaims had been filed, Dietz pursued a legal strategy outside of the courtroom to amend the 1978 Declaration by joining forces with the owners of four other units. The owners of these five units—making up 62.5% of the units in Captains Quarters—created the 2021 Declaration by entering into and recording in the land records an Amended Declaration dated June 30, 2021, and a First Amendment to Amended Declaration dated July 29, 2021. Owners of the three other units—Logan, the Cochranes, and the owners of another unit—were not parties to the 2021 Declaration.

In the recitals of the 2021 Declaration, the five unit owners wrote, "the Parties, [Dietz and the owners of four other units], comprise a homeowners association governed by the Declaration pursuant to Title 11B of the Real Property Article of the Maryland Annotated Code[.]" The 2021 Declaration cites § 11B-116 of the HOA Act as authority to amend the 1978 Declaration with fewer than all units consenting:

> WHEREAS, the Parties, desiring to amend the [1978] Declaration pursuant to Section 11B-116 of the aforesaid Real Property Article have secured the affirmative vote of 5 unit votes out of the total of 8 unit votes in the development in accordance with the requirements of Section 11B-116 of Title 11B aforesaid.

The 2021 Declaration made material changes to the 1978 Declaration. While the 1978 Declaration required unanimous consent of unit owners to make changes to an owner's townhouse, the 2021 Declaration—in Paragraph 1, Subparagraph A— provides that "upon the express written consent of four (4) of the remaining seven (7) lot owners, any lot owner may add additional stories of vertical and/or horizontal space to any

10

improvement on his/her lot and shall have the right to erect a party wall or walls with neighboring units at such unit owner's sole cost and expense."

Similarly, the 2021 Declaration in Paragraph 6 provides that "[n]o lot owner may alter, modify or change the exterior walls of the residential building located on his or her lot in any form or fashion, including but not limited to painting, without the express written consent of four (4) of the remaining seven (7) lot owners."[2]

In addition, Paragraph 6 of the 2021 Declaration retroactively approved the alterations made by Dietz that were being challenged in the pending court case by stating that "[a]ll of the parties hereto hereby give their written consent to all alterations, modifications and changes to the exterior walls that exist on the date of execution hereof."

### E.    Amended Claims & Circuit Court Proceedings

After the actions by Dietz to adopt and record the 2021 Declaration, Logan filed a Second and Third Amended Complaint against Dietz and the other unit owners. In part, he alleged that "Defendants . . . allegedly voted on and subsequently signed an amendment to the Declaration . . . and filed the same among the Land Records for Worcester County[.]" Logan requested that the court declare the 2021 Declaration null and void because the HOA Act did not apply to the original 1978 Declaration.

---

[2] The first iteration of the 2021 Declaration, dated June 30, 2021, had required five of the seven remaining lot owners to consent to certain changes. The amendment, dated July 29, 2021, lowered this threshold from five to four of the seven remaining lot owners. At a motions hearing, counsel explained that they "ha[d] to amend the [2021] [D]eclaration because [they] made a mistake in the first amended declaration where we wanted to lower the vote threshold . . . because the owner who's making an improvement can't vote[,]" acknowledging that they had "got it wrong, so [they] had to amend it."

In response, Dietz filed amended counterclaims against Logan. The amended counterclaims first asserted that the restrictive covenants had been abandoned because they had not been enforced in forty-three years. One counterclaim alleged that, "[t]he restrictive covenants . . . serve no purpose since the original appearance of the eight units, through unique improvements made by the various unit owners individually over the past forty-three (43) years, has changed the overall appearance significantly without objection."

The counterclaims further argued that enforcing the 1978 Declaration would be unreasonable and impossible:

> To impose the restrictive covenants . . . to one unit owner and not to require a complete return of all units to their original state would be arbitrary and unreasonable, much less impossible to do since the materials for roofing, siding, windows, HVAC and other exterior materials of 1978 can no longer be found in 2021 and those of 1978 are obsolete.

In addition to the abandonment claim, the amended counterclaims requested that the court declare that Dietz's renovations had been approved by the 2021 Declaration.

Logan and Dietz both moved for summary judgment on the issue of whether the 2021 Declaration was applicable to the underlying dispute. Logan argued that the 1978 Declaration governed the dispute because the HOA Act did not apply to Captains Quarters as the development did not have a homeowners association. In support, he asserted that

> [t]he lots/units on the Captains Quarters Plat have no governing body or directors/board member of any kind. There are no common elements that require the maintenance of an association. There ha[ve] never been any assessment or dues. There are no association documents kept in the depository with the Clerk of the Court as contemplated by [the HOA Act]. There ha[ve] never been any disclosures provided to any unit owner by the developer or thereafter by any selling owner during a re-sale as to any information regarding a homeowners association as contemplated by [the HOA Act].

12

On that account, Logan sought summary judgment on the third count of his Third Amended Complaint which asked the court to declare the 2021 Declaration null and void. Logan subsequently moved for summary judgment on the first and second counts of his complaint which asked the court to declare that Dietz had violated the 1978 Declaration, enjoin him from making additional alterations, and direct him to return his unit to its prior condition.

Dietz argued that the 2021 Declaration applied because the HOA Act was applicable and allowed the original 1978 Declaration to be amended with at least 60% of lot owners approving. According to Dietz, he and the owners of four other units had satisfied this requirement because they made up 62.5% of the lots. Dietz relied on the definitions of "homeowners association" and "declaration" under the Act to argue that, despite the lack of authority in the 1978 Declaration to create a homeowners association and the nonexistence of a governing body, the HOA Act still applied to the Captains Quarters development because the development and the declaration satisfied the relevant definitions under the statute. The Act defines a "homeowners association" as "a person having the authority to enforce the provisions of a declaration." RP § 11B-101(i)(1). A "declaration" is defined as "an instrument . . . that creates the authority for a homeowners association to impose . . . any mandatory fee in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots." RP § 11B-101(d)(1).

According to Dietz, the 1978 Declaration and the 2021 Declaration created the authority of a homeowners association because each unit owner was entitled to enforce the declaration's provisions. In addition, he argued that, despite the absence of an existing homeowners association, each unit owner should be considered an association in this case:

13

While Captains Quarters Townhouses does not have a governing body as required by [the HOA Act], each individual homeowner is . . . an association entitled to enforce the recorded covenants and restrictions – e.g. the Declaration and any amendments. The declarant (e.g. the developer) was responsible for establishing the governing body and the unit owners could have pursued the enforcement of this provision at anytime, but have never chosen to have a governing body. [citation omitted] Absent the governing body taking action in this case, each lot owner has been empowered by the governing document through their respective deeds, to enforce the provisions of said document because the covenants and restrictions run with the land.

Accordingly, he requested summary judgment in his favor on all counts of Logan's complaint and Dietz's counterclaim.

The court held a hearing on the dueling motions for summary judgment. Logan argued that "if you look in the Homeowners Association Act, declaration is defined as an instrument recorded among the land records [where] the property of the declarant is located that creates the authority for a homeowners association to impose [fees] on lots. [Captains Quarters'] declaration that was signed in 1978 simply doesn't create the authority for a homeowners association."

He noted that the term "homeowners association" is not used in the 1978 Declaration. Moreover, he said that nothing in the provisions of the governing document grants the authority typically assigned to a homeowners association: "There's no dues. There's no governing body. No election. No budget. No meetings. They didn't deposit a copy of any governing documents with the clerk of the court. There's never been a resale certificate issued . . . . [I]t simply isn't a homeowners association." He further asserted that "not every set of covenants and restrictions is a homeowners association. [There are] tons that are not."

14

Logan rebutted Dietz's argument that there was a homeowners association based on the definition of a declaration:

> So in order to be a homeowners association, [Dietz has] looked to the term of the definition of declaration and that is a document that creates the authority to impose fees on its members. So in order to have a declaration you have to have a homeowners association that can impose fees. We don't have that because it first requires a homeowners association. Their definition that they're pointing to of a homeowners association is simply someone that can enforce a declaration. And so they can't enforce a declaration in this case because they don't have a declaration as it's defined under the law because a declaration requires that you first have a homeowners association.

Dietz, on the other hand, argued that there was a homeowners association under the HOA Act. He maintained that the 1978 Declaration was a declaration as defined in the HOA Act because it included mandatory fees and expenses required to be paid by all unit owners. These "mandatory fees" under the original 1978 Declaration, according to Dietz, include the shared obligation to pay repair expenses for the roof, structural support elements, underground elements, and parking area. He reasoned that, just because the development did not have the typical characteristics of a homeowners association, does not mean that there was not legally a homeowners association under the statutory definition.

The court granted summary judgment in part in favor of Dietz and dismissed Logan's complaint entirely.[3] In so doing, the circuit court ruled as follows:

1) That there is not any genuine dispute as to any material fact necessary for this Court to resolve the controversy . . . as a matter of law;

---

[3] The Circuit Court issued two orders. The first Opinion and Order, dated October 19, 2021, denied summary judgment to Logan on his claim that the Amended Declaration was null and void; granted summary judgment to Dietz on his claim that there was a *de jure* homeowners association under the HOA Act; and directed the parties to address the cross-

15

2) The [1978] Declaration created a private right of enforcement as to maintenance of the roof, parking lot, and utility infrastructure such that each unit owner is a "homeowners association" under the Maryland Homeowners Association Act, defined as "a person having the authority to enforce the provisions of a declaration;" and

3) By providing for shared financial responsibility for maintenance of common elements, the [1978] Declaration "creates the authority for a homeowners association to impose on lots, or on the owners or occupants of lots . . . mandatory fee[s] in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas," such that the [1978] Declaration qualifies as a Declaration under the Homeowners Association Act.

The circuit court thus concluded "that the original [1978] Declaration [gave] rise to a *de jure* homeowners association[.]" It further determined that the 2021 Declaration complied with the HOA Act having received more than 60% of votes required for approval. As a result, the 2021 Declaration governed the dispute between Logan and Dietz and mandated the lawsuit's dismissal because the 2021 Declaration had retroactively approved Dietz's alterations to his unit.

Logan now appeals the circuit court's decision to this Court.

---

motions for summary judgment on the issue of declaratory and injunctive relief pertaining to the alterations Dietz made to his townhouse and the continued enforceability of the covenants in the 1978 Declaration. Following a hearing, the circuit court issued a Memorandum Order, dated December 16, 2021, dismissing Logan's lawsuit in its entirety because the 2021 Declaration was lawful and had retroactively approved Dietz's alterations.

## DISCUSSION

### A.    *Standard of Review*

The Court reviews a circuit court's grant of summary judgment *de novo*.  *Friends of Frederick Cnty. v. Town of New Market*, 224 Md. App. 185, 192 (2015).  The circuit court should grant summary judgment "when there is no genuine dispute as to any material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law." *Worsham v. Ehrlich*, 181 Md. App. 711, 723 (2008).  In determining if the circuit court's grant of summary judgment was proper, the Court "independently review[s] the record in the light most favorable to the non-moving party to decide whether there are issues of material fact." *Friends of Frederick Cnty.*, 224 Md. App. at 192.

"The interpretation of a statute is a question of law that this Court reviews *de novo*." *Berry v. Queen*, 469 Md. 674, 686 (2020).  In addition, the interpretation of a written instrument establishing easements and covenants is a question of law that the Court likewise reviews *de novo*.  *White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 31 (2008).

### B.    *Parties' Contentions*

There is no dispute over the material facts in this case.  The only issue before the Court is whether Dietz was entitled to judgment as a matter of law.  In our *de novo* review, we must determine whether the circuit court correctly interpreted the HOA Act and correctly applied it to the 1978 Declaration and the 2021 Declaration.

Logan asserts that the circuit court incorrectly interpreted the HOA Act.  He claims that the circuit court improperly implied the existence of a homeowners association or

17

incorrectly created one *de jure* when, in fact, the 1978 Declaration controls and provides no authority for a homeowners association. Instead, he argues that the 1978 Declaration was a declaration of common use and maintenance obligations that did not authorize a homeowners association. As such, the 1978 Declaration established only restrictive covenants and contractual relationships that could be self-enforced. Logan explains that Captains Quarters did not have any of the characteristics required by statute of a homeowners association—a governing body, books and records, bylaws, common elements to the community, assessment of fees, and required disclosures. He further contends that each individual unit owner cannot be a "homeowners association" as a matter of right ("*de jure*") or by implication.

Logan further argues that the 1978 Declaration is not a "declaration" under the HOA Act. He contends that, while the 1978 Declaration calls for shared financial responsibility for certain maintenance expenses, it does not impose a "mandatory fee" which would transform the agreement into a "declaration" as specified by the HOA Act.

He reasons that, because there is no homeowners association or "declaration" as contemplated under the Act, the 1978 Declaration could not be amended under the procedures outlined in the HOA Act. Accordingly, the 1978 Declaration would govern the dispute between Logan and Dietz instead of the 2021 Declaration.

In response, Dietz argues that the circuit court correctly applied the HOA Act to the declarations governing Captains Quarters. He contends that each unit owner is individually a "homeowners association" under the Act because each unit owner has the authority to enforce the governing declaration. Likewise, he claims that Captains Quarters had a

18

qualifying declaration under the Act because the 1978 Declaration contained a "mandatory fee." It did so, according to Dietz, by requiring the owners of each unit to contribute one-eighth of the cost for joint expenses of the development, such as repairs to the structural support, roof, and parking pad.

Altogether, Dietz asserts that, because the unit owners of Captains Quarters qualify as "homeowners associations," they could amend the 1978 Declaration according to the Act with the approval of 60% of unit votes. Thus, according to Dietz, the 2021 Declaration governs the present dispute between him and Logan and renders the controversy moot by retroactively approving his alterations.

## C. *A "Homeowners Association" and "Declaration" Under the HOA Act*

The circuit court in this case found that under the definitions of "homeowners association," "person," and "declaration," each unit owner qualified to be a "homeowners association" because the 1978 Declaration allowed each owner a private right to enforce the provisions of the declaration. Thus, the circuit court ruled "that the original [1978] Declaration [gave] rise to a *de jure* homeowners association[.]"

We disagree with the circuit court's interpretation of the HOA Act and conclude that there was not a homeowners association authorized or established under the 1978 Declaration. Our analysis of the plain language and legislative history of the HOA Act follows.

We begin by examining the plain language of the HOA Act. Our ultimate purpose when conducting statutory interpretation "is to ascertain the General Assembly's purpose and intent when it enacted the statute." *Berry*, 469 Md. at 687. The statutory interpretation

19

framework begins with the plain language of the statute, *Blackstone v. Sharma*, 461 Md. 87, 113 (2018), because "[w]e assume that the legislature's intent is expressed in the statutory language[.]" *Phillips v. State*, 451 Md. 180, 196 (2017).

While much of the HOA Act has changed over the years since 1987, the definition of "homeowners association" has not.  That term has always been defined as "a person having the authority to enforce the provisions of a declaration." *Compare* RP § 11B-101(i), *with* 1987 Md Laws ch. 321, RP § 11B-101(f).  It follows, then, that the meaning that the legislature intended for the term when the law was first enacted in 1987 remains the meaning for it today.  This definition yields two questions: what is a "person," and what is a "declaration"?

### 1. *What is a "Person"?*

The HOA Act defines a homeowners association using the word "person":

> (a) In this title the following words have the meanings indicated, unless the context requires otherwise.

*     *     *

> (i) (1) "Homeowners association" means a person having the authority to enforce the provisions of a declaration.
>
> (2) "Homeowners association" includes an incorporated or unincorporated association.

RP § 11B-101(a), (i).

We begin with the plain language analysis of the word "person."  However, instead of turning to a dictionary definition, we must start with the definitions found at Title 1 of the Real Property Article, which defines "person" for purposes of the entire Article:

20

(a) In this article the following words have the meaning indicated unless otherwise apparent from the context.

\* \* \*

(j) "Person" includes an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or representative of any kind, or any partnership, firm, association, public or private corporation, or any other entity."

RP § 1-101(a), (j).

Applying this definition to the HOA Act, the word "person" paired with "having the authority to enforce . . . a declaration" sheds light on how "person" should be interpreted within the HOA Act. The definition of "person" in Title 1 uses the word "includes." Again, instead of turning to the dictionary, the General Assembly has provided a statutory definition for the words "includes" or "including." In the General Provisions Article, these two words are defined under the Title 1 rules of interpretation for the entire Maryland Code: "'Includes' or 'including' means includes or including by way of illustration and not by way of limitation[,]" Md. Code (2014, 2019 Repl. Vol., 2022 Supp.) Gen. Prov. § 1-110,[4] unless the statutory context would indicate otherwise, Gen. Prov. § 1-101.

When the General Assembly uses "includes" in a definition instead of "means," it establishes a non-exhaustive list of potential items that can satisfy the statutory definition. *See Clark v. State*, 473 Md. 607, 619–20 (2021) (addressing the use of "includes" in a

---

[4] The definition of the words "includes" and "including" were added to the Rules of Interpretation for the entire Maryland Code by Chapter 3 of the 1986 Laws of Maryland at the request of the Revisor of Statutes. 1986 Md. Laws ch. 3; S.B. 73, 1986 Leg., 396th Sess. (Md. 1986). The preamble includes an explanation that the legislation intended "[t]o make it clear that words such as 'includes' or 'including' are used through the Annotated Code of Maryland by way of illustration and expansion, and not by way of limitation or restriction, unless the context requires otherwise[.]" 1986 Md. Laws ch. 3.

21

statutory definition of "firearm").  "Includes" designates that the words following the term defined are illustrative and non-exhaustive.  *Id.*  This also means that, where an illustrative list follows a definition using the word "includes," not every item of the list will necessarily apply in every context in which the word is used throughout the provisions to which the definition applies.  This is especially the case since the term "person" applies to the entire Real Property Article and is used over 200 times throughout this statute.

Thus, applying this Title 1 definition, the term "person" within the context of the definition of "homeowners association" refers to the entity or someone in their representative capacity authorized to act on behalf of an association.  As such, it is logical, then, that a person acting in their individual capacity cannot be a homeowners association.  This is reinforced by the clause at RP § 11B-101(i)(2) which states that the association may be incorporated or unincorporated, thus inferring some type of governing body and not an individual.

To confirm this interpretation, let's take a closer look at the two series of words found in the definition of "person" at RP § 1-101(j).  The word "individual" is in the first series which concludes with a "representative of any kind": "'Person' includes an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or *representative of any kind*[.]"  (Emphasis added.)  The definition follows with a second series that concludes with "any other entity": "'Person' includes . . . any partnership, firm, association, public or private corporation, or *any other entity*."  (Emphasis added.)

Terms should be "interpreted in conformity with the meaning of [their] companion terms."  *100  Harborview Drive Condo. Council of Unit Owners v. Clark*, 224 Md. App.

22

13, 40 (2015). The canon of statutory construction—*noscitur a sociis*—"suggests 'that words grouped in a list should be given related meaning[.]'" *Manger v. Fraternal Order of Police, Montgomery Cnty. Lodge 35, Inc.*, 227 Md. App. 141, 149 (2016) (quoting *Massachusetts v. Morash*, 490 U.S. 107, 114–15 (1989)). Accordingly, we determine that an "individual" in this definition relates to a "representative," just as "partnership, firm, association," and "corporation" relate to a form of "entity" given the proximity of the terms within their respective series.

While the circuit court viewed each individual homeowner as a *de jure* homeowners association, it is clear from the statutory language that this is incorrect. The "person" or "individual" in this context is a "representative" with authority to act on behalf of the governing body of the homeowners association but not in their own individual or personal capacity. The statute anticipates that, for some small homeowners associations, there might be just one individual serving as the representative of the governing body. But that does not make each homeowner within the development their own homeowners association.

As illustrated above, we view the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Johnson v. State*, 467 Md. 362, 372 (2020) (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). "To this end, it may be beneficial to 'analyze the statute's "relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case."'" *Berry*, 469 Md. at 687 (quoting *Blackstone*, 461 Md. at 114). Ultimately, we strive to reach an interpretation that

23

is reasonable, "not one that is absurd, illogical or incompatible with common sense." *State v. Bey*, 452 Md. 255, 266 (2017) (quoting *Johnson*, 415 Md. at 421–22).

The HOA Act contains other definitions that shed light on our plain language interpretation of the term of "homeowners association." For example, the term "governing body" appears just before "homeowners association" in the definitions section of the HOA Act:

> (h)     "Governing body" means the homeowners association, board of directors, or *other entity* established to govern the development.

RP § 11B-101(h) (emphasis added).

Under the same principle of *noscitur a sociis*, the fact that the General Assembly concluded this definition with the phrase "other entity" implies that the preceding terms— homeowners association and board of directors—are also forms of entities. Thus, although the definition of "homeowners association" uses the term "person," which itself includes an individual, the inclusion of "homeowners association" within this list of entities reinforces the intent of the General Assembly that the term encompasses a form of entity or organization—not a homeowner acting in his or her individual capacity to enforce covenants.

It is important to recognize that this interpretation does not contradict the definition of "person" in Title 1. The definitions section at RP § 1-101(a) begins by stating that the stated definitions "have the meanings indicated *unless otherwise apparent from context*." (Emphasis added.) It is apparent from the statutory context of the term "homeowners association" that the use of the word "person" is limited to those entities included in its

definition—partnership, firm, association, public or private corporation, or other entity— and those persons acting in a representative capacity of the association—an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or other representative.

Another statutory section—RP § 11B-106.1—supports this interpretation as well. This section governs the election of the governing body of the homeowners association. It requires that the "meeting of the members of the homeowners association to elect a governing body of the homeowners association . . . be held within" a certain time period. RP § 11B-106.1(a). The phrasing of this provision indicates that a homeowners association is itself an organization of which the lot owners are members and that a governing body is a subset of the members elected by the lot owners to handle homeowners association matters.

The circuit court's determination that each unit owner was individually a homeowners association was based upon a misreading of the use of the word "person" under its ordinary dictionary definition and not under the statutory definition at RP § 1-101(j) that controls the entire Real Property article. Our foregoing statutory analysis of the term "homeowners association" compels the conclusion that a homeowners association must be a more formal organization or entity, whether incorporated or unincorporated, instead of every individual unit owner being a separate homeowners association.

This conclusion is further underscored by a different article of the Maryland Code that addresses legal claims against a homeowners association. Section 5-422(b) of the Courts & Judicial Proceedings ("CJP") Article requires that "a person sustaining an injury

25

as a result of the tortious act of an officer or a director of a governing body [as defined in the HOA Act] while the officer or director is acting within the scope of the officer's or director's duties may recover only in an action brought against the governing body for the actual damages sustained." Further, CJP § 5-422(d) adds that "a claimant shall name only the governing body as a party defendant" in the suit unless the governing body cannot be readily determined. We explained in *Reiner v. Ehrlich* that, under CJP § 5-422, a homeowner aggrieved by the action of a homeowners association must sue the entity representing the homeowners association instead of individual homeowners. 212 Md. App. 142, 161–62 (2013).

Under the statutory interpretation proposed by Dietz that each person who owns a unit is their own homeowners association, the CJP § 5-422(d) requirement that only a governing body be named as a party defendant could be averted and suit could be filed against each unit owner as their own homeowners association. Such an interpretation would render meaningless the CJP § 5-422 requirement that only the organization or entity operating as the governing body of a homeowners association be named as a defendant.

2.     *What is a "Declaration"?*

The circuit court determined that the one-eighth contribution required by a Captains Quarters unit owner for common use and maintenance obligations under the 1978 Declaration qualified as a "mandatory fee" under the HOA statute. Specifically, the circuit court order dated October 19, 2021 stated:

> 3)   By providing for shared financial responsibility for maintenance of common elements, the original [1978] Declaration "create[d] the authority for a homeowners association to impose on lots, or on the owners or

26

occupants of lots . . . mandatory fee(s) in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common area," such that the Declaration qualifies as a Declaration under the Homeowners Association Act.

This ruling by the circuit court runs contrary to the plain language of the statute and the caselaw of Maryland appellate courts that examines the definition and characteristics of a mandatory fee under the HOA Act.

Again, we begin with the plain language of the statute. The definition of "declaration" in the HOA Act specifies the requirement that there be authority for a mandatory fee as follows:

(a) In this title the following words have the meanings indicated, unless the context requires otherwise.

* * *

(d) (1)  "Declaration" means an instrument, however denominated, recorded among the land records of the county in which the property of the declarant is located, that creates the authority for a homeowners association to impose on lots, or on the owners or occupants of lots, or on another homeowners association, condominium, or cooperative housing corporation any mandatory fee in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas.

(2)  "Declaration" includes any amendment or supplement to the instruments described in paragraph (1) of this subsection.

(3)  "Declaration does not include a private right-of-way or similar agreement unless it requires a mandatory fee payable annually or at more frequent intervals.

RP § 11B-101(a), (d).

The phrase "mandatory fee" is not defined in the HOA Act. Apart from its inclusion in the definition of "declaration," the term appears nine other times throughout the Act.

27

*See* RP §§ 11B-105(a)(2)-(3); 11B-105(b)(9); 11B-106(a)(2)-(3); 11B-107(a)(2)-(3); 11B-108(c). In each instance, the term is used to refer to a fee that the homeowners anticipate being assessed at regular intervals (e.g., monthly, quarterly, or annually) to support the costs for maintaining the development.

If we again look at the statutory context, the fact that the mandatory fee is an established amount assessed at regular intervals is reinforced by RP §§ 11B-105(a)(2)-(3), 11B-106(a)(2)-(3), and 11B-107(a)(2)-(3), which each provide that contracts for sale or resale of lots are not enforceable unless "[t]he purchaser is given any changes in mandatory fees and payments exceeding 10 percent of the amount previously stated to exist[.]" In addition, RP § 11B-105(b)(9) requires that the purchaser be given "[a] statement of current or anticipated mandatory fees or assessments to be paid by owners of lots within the development for the use, maintenance, and operation of common areas and for other purposes related to the homeowners association[.]" Finally, RP § 11B-108(c) allows a purchaser to cancel a contract "following receipt of a change in mandatory fees and payments exceeding 10 percent of the amount previously stated to exist" if it "adversely affects" them.

Similarly, subparagraph (3) in the definition of "declaration" underscores this interpretation. Its emphasis on subjecting those more casual arrangements—such as "a private right-of-way or similar agreement"—only if they involve "a mandatory fee payable annually or at more frequent intervals" demonstrates that the Act was intended to cover communities subject to mandatory fees that are assessed at regular intervals. In some respects, the 1978 Declaration operates as one of those "similar" agreements excluded from

28

the definition.  With certain shared easements and the requirement to share pro rata in certain repair expenses, it did not establish an arrangement whereby the homeowners would anticipate regularly assessed fees.

It is clear that the General Assembly intended that the authority to assess a "mandatory fee" must be specifically stated in the declaration.  In this regard, it is different from a pro rata contribution by unit owners to common use maintenance obligations on an as-needed basis.[5]  The language of the 1978 Declaration does not contain any authority in the document which would create "authority for a homeowners association to impose . . . any mandatory fee[.]" *See* RP § 11B-101(d)(1).  The 1978 Declaration did not provide for regular, pre-determined payments by unit owners.  No mechanism was put in place to collect assessments.  No recurring assessments were established.  The document only establishes a right of contribution for a one-eighth share for common use maintenance obligations as specified in the declaration.

This interpretation is bolstered by the common meaning of the word "impose."  The definition language of "declaration" requires that the homeowners association be authorized to "*impose* any mandatory fee." RP § 11B-101(d)(1) (emphasis added).  Black's

---

[5] We should distinguish here the terms "mandatory fee" and "special assessment."  In addition to the "mandatory fee," a declaration for a homeowners association typically provides for a "special assessment" that the governing body may impose for common use improvements where the one-time costs exceed the funds available in the budget reserve fund. *See, e.g.*, Wilbert Washington, II, *A Model Homeowners Association Declaration of Covenants, Conditions, and Restrictions*, 23 No. 4 Prac. Real Est. Law. 23, 34 (July 2007).  In addition, Maryland's HOA Act allows a governing body to increase an assessment to cover its required reserve funding even if a provision of a governing document says otherwise.  RP § 11B-117(a)(2).

Law Dictionary defines "impose" as "[t]o levy or exact[.]" *Impose*, Black's Law Dictionary (11th ed. 2019); *accord State ex rel. Stevens v. Nickerson*, 151 N.W. 981, 982 (Neb. 1915) (using "to . . . levy or exact as by authority" as the definition of "impose" in the context of licenses to fish and hunt). The Supreme Court of Montana noted that the word "impose" "is derived from the Latin word 'imponere,' meaning literally 'to lay upon.'" *State v. Camp Sing*, 44 P. 516, 520 (Mont. 1896).

The use of the term "impose" in defining "declaration" signifies that the HOA Act was meant to apply to those developments in which a formal organization, acting under specified authority from the declaration, could issue charges on lots, owners, or occupants, which they are required to pay. "Impose" conveys more than an arrangement to share costs among neighbors should the need arise. In the common vernacular, no one would refer to such an arrangement as a neighbor's ability to "impose" the requirement to pay on another. Such a term is reserved for situations where a formal entity or organization is capable of issuing a charge that individuals are required to pay.

This Court examined the issue of mandatory fees, as well as the distinctions between a declaration creating a homeowners association and a declaration that does not, in *White v. Pines Community Improvement Association, Inc.*, 173 Md. App. 13, 28–29 (2007), *aff'd and vacated in part*, 403 Md. 13 (2008). In that case, homeowners sought access to community land in the development which was owned by the neighborhood improvement association. *Id.* at 28–29. Deeds to the owners in the community conveyed "the *use in common with others* entitled thereto of the *lots of ground designated as Community Lot*" on the development's recorded plat. *Id.* at 30. This Court determined that the "use in

30

common" language contained in the deeds within the development created an "express easement" allowing homeowners within the development to use the community land and associated riparian rights but that the improvement association held title to that land and the riparian rights. *Id.* at 39, 45.

This Court described the community improvement association as "a *voluntary membership organization* that presently has a regular membership of approximately 114 lot owners[,]" *id.* at 30 (emphasis added), of "approximately 250 single family lots[,]" *id.* On appeal, our Supreme Court[6] also noted the voluntary nature of the community association. *White*, 403 Md. at 23. It further explained that "the record d[id] not reveal that the creation of a community association was provided for by covenants in the relevant instruments in the chain of title[,]" thus suggesting that an organization operating as a homeowners association would be expressly created in a recorded instrument associated with the development. *Id.* at 23 n.8.

The circuit court had determined that the improvement association could assess fees or fines on community members that had not joined the association for their use of piers extending from the community land. *White*, 173 Md. App. at 62. In deciding to the contrary, we further described the nature of community improvement association:

> The [Pines Community Improvement Association] does not qualify as a homeowner[]s association under authority of the Maryland Homeowner[]s Association Act (The Act). A duly qualified homeowner[]s association

---

[6] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See* Md. Rule 1-101.1(a).

31

under The Act requires that a declaration be recorded and absent such filing, the [Pines Community Improvement Association] may not enforce the collection of mandatory fees as a homeowner[]s association.

*Id.* at 63 (citing RP § 11B-101(d)) (footnote omitted). Although we focused on the lack of a declaration being recorded, restrictive covenants and an easement relating to community land were specified in the Pines Community resident's recorded deeds. *Id.* at 30, 74. The more pertinent fact in concluding that the improvement association was not a homeowners association was that no recorded documents had provided the Pines Community Improvement Association the authority to assess mandatory fees. *See id.* at 68 ("[T]he title instruments . . . do not provide for any charge to be assessed to lot owners."); *White*, 403 Md. at 45 (noting that the Court was "unable to find . . . any conveyance" that authorized the association "to charge any fee for the use of the piers").

Without having the authority of a homeowners association to impose fees, we explained that users of an easement should contribute to its maintenance "in proportions that closely approximate their usage." *Id.* at 66 (quoting *Drolsum v. Luzuriaga*, 93 Md. App. 1, 22 (1992)). We also said, however, that the fees that the community improvement association was attempting to charge community members that were not members of the association could not "be considered reasonable maintenance fees in proportion of use of the easement" and thus could not be assessed against the non-members. *Id.* Further, we said that "[t]he fact that those sharing a common easement may be responsible for its maintenance does not make the several landowners a common-interest community[.]" *Id.* at 67. "The [Pines Community Improvement Association's] right to require reasonable

maintenance fees comes from a shared right of use in the easement and not from its status as a community association or by a covenant in lot owners' deeds." *Id.* at 68.

The Supreme Court generally agreed with our decision with regard to the association's imposition of fees, *White*, 403 Md. at 21–22, and further noted that it "ha[d] found no conveyance that expressly grant[ed] [the association] such power[,]" *id.* at 46. Thus, our appellate courts distinguished between those communities with declarations that authorize a homeowners association, which is created in a recorded instrument and authorized to impose fees, and those communities with a declaration creating a use in common easement with shared maintenance obligations.

From the foregoing statutory analysis, we can conclude that a development subject to a homeowners association is created by the developer under a declaration or other recorded instrument that authorizes an entity to govern the community and empowers it to impose anticipated, recurring fees that must be paid by homeowners. The developer, governing organization, and members of the organization must abide by the HOA Act. On the other hand, developers may impose restrictive covenants through a declaration of common use and maintenance obligations without the creation of a homeowners association. Under the HOA Act, such communities would be subject to the Act only if they have a mandatory fee structure such as we have described above in this opinion.

### D.   *Legislative History of the HOA Act*

It is the "modern tendency" of Maryland appellate courts "to continue the analysis of the statute beyond the plain meaning" of the statutory language. *In re S.K.*, 466 Md. 31, 50 (2019). An examination of the legislative history helps confirm that our plain language

interpretation of the statute is consistent with the legislature's intent. *Id*. In doing so, the courts may examine "the context of the statute, the overall statutory scheme, and archival legislative history of relevant enactments." *Id*. (quoting *Brown v. State*, 454 Md. 546, 551 (2017)).

Our conclusions above are supported by the legislative history of the original HOA Act and the many revisions to the Act passed over the subsequent years.[7] The passage of the original HOA Act was recommended by a blue-ribbon panel that examined model statutes for condominiums, cooperative housing, and developments with homeowners associations, and made legislative recommendations to the General Assembly. As the use of these housing types expanded across Maryland, citizens raised concerns about inconsistent standards, lack of public disclosure and the need for uniform practices in the creation, regulation, and management of common ownership communities.

In response to citizen concerns, Governor Harry R. Hughes appointed the Governor's Commission on Condominiums, Cooperatives and Homeowners Associations in February 1982, "charging the Commission with the responsibility of studying problems with state law governing condominiums and similar homeowners associations, and asking the Commission to make legislative recommendations for improved state law in these areas." Governor's Comm'n on Condos., Coops. and Homeowners Ass'ns., Final Report

---

[7] The General Assembly has made 52 revisions to the HOA Act since its enactment 35 years ago by legislation enacted in each of the following years: 1988, 1989, 1990, 1998, 1999, 2000, 2001, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

– 1985 Legislative Session, at 1 (Feb. 14, 1985). The Governor's Commission held a public hearing in 1984, which yielded consistent public testimony on "the need to disclose to prospective purchasers that they were buying into a homeowners association and their legal obligations as a result of that" and the ability of the governing body to enforce rules and collect assessments. *Id.* at 9.

As a result of its study concerning homeowners associations, the Governor's Commission issued Final Reports in 1985 and 1986. It "recommend[ed] legislation[8] which [was] basically intended to provide consumers with adequate disclosure about the homeowners association in which they [would] become members, to provide basic warranties on common areas in the homeowners association, and to provide fundamental provisions governing the operation of homeowners associations." *Id.*

In its 1985 Final Report, the Governor's Commission defined a homeowners association as "any organization or association of homeowners, not including a condominium or cooperative housing corporation, that is authorized by a legally recorded instrument to impose fees or assessments on lots or the owners or occupants of lots for the provision of services to lots or common areas within the association property." *Id.* at 10. It explained further in 1986 Final Report that the HOA Act was only intended to affect developments with a homeowners association that has authority to impose mandatory fees. Governor's Comm'n on Condos., Coops. and Homeowners Ass'ns, Final Report – 1986 Legislative Session, at 7 (Jan. 27, 1986). It described a homeowners association as "that

---

[8] An early version of the HOA Act was introduced but failed in 1985. S.B. 630 & H.B. 1548, 1985 Leg., 393d Sess. (Md. 1985).

entity, whether incorporated or unincorporated, governing the affairs of the owners within the development, having the authority to enforce the provisions of a declaration." *Id.* (emphasis removed). The Commission further explained that "not all residential projects fall within the purview of the Act. For example, the Act does not extend to those projects whose homeowners associations have the power to enforce restrictive covenants but lack the authority to impose a mandatory fee." *Id.*

In 1986, both chambers of the General Assembly passed Senate Bill 475, an early version of the HOA Act, but it failed to become law due to a procedural oversight. A dispute over amendments was resolved when both chambers concurred on the same amendments, but, when the Senate concurred, it "neglected to actually vote on" the bill for final passage.[9] Roger D. Winston, *Homeowners Associations in Maryland*, *in* Condos, Co-

---

[9] Under Rule 59(a)(2) of the Senate Rules, after the Senate concurs with House amendments to a bill, there must be a vote for final passage:

> **59. Bills Amended in the Opposite House.** (a)(1) When a Senate Bill or Joint Resolution has been returned to the Senate from the House of Delegates, endorsed "read the third time and passed by yeas and nays, with amendment," or with words of similar import, the President shall call each amendment to the attention of the Senate and cause it to be read. In the absence of a motion from the floor, the President shall put the question "Will the Senate concur in the House amendment?" *(2) If the Senate concurs in the House amendment, the Bill or Joint Resolution in its amended form shall be immediately put upon its final passage by yeas and nays.* (3) If the Senate refuses to concur in the House amendment, the Bill or Joint Resolution fails, except that the Senate by message accompanied by the Bill or Joint Resolution may request the House to recede from its amendment.

Rules of the Senate of Maryland, at 39–40 (Regular Session 1986) (second emphasis added). For Senate Bill 475, there were three House amendments of which the Senate concurred on two and requested that the House recede from one amendment. Later, the

Ops & HOA's: New Alternatives, New Concerns For Developers 199, 200 (Md. Inst. For Continuing Pro. Educ. Nov. 1986); *see also* Richard A. Ransom & Mari R. Stanley, *The Proposed Maryland Homeowners Association Act*, 20 Md. B. J. 22, 22 (1987).

The General Assembly again considered the prior year's bill and passed the HOA Act in the 1987 legislative session with the passage of Senate Bill 96, and it became law. 1987 Md. Laws ch. 321. The legislative history from the Governor's Commission's Final Reports indicate that the HOA Act was only intended to apply to organizations or entities operating as a homeowners association as authorized by a declaration filed in the land records. Nothing in the legislative history envisioned that individual homeowners could each be a homeowners association.

The General Assembly adopted the Governor's Commission's work product with only minor amendments. The definition of a "homeowners association" remained the same from its introduction in 1986 to final passage. *Compare* S.B. 475, 1986 Leg., 396th Sess. (Md. 1986), RP § 11B-101(f), *with* 1987 Md. Laws ch. 321, RP § 11B-101(f). Without evidence indicating that the General Assembly intentionally changed the meaning of the term "homeowners association" to be an individual person, we must assume that the legislature intended to follow the Commission's reports that a "homeowners association" is a form of entity or organization and did not intend that an individual homeowner would operate as a "homeowners association" under the HOA Act.

---

House did recede and sent a message that was read and journalized in the Senate. However, the Senate failed to consider the bill on a third reader vote for final passage.

One of the driving forces for the 1987 HOA Act was to require disclosure to potential purchasers that a housing unit was subject to the authority of a homeowners association and to insure due process protections to owners within an HOA. *See* Md. Gen. Assembly Dep't Fiscal Servs., Revised Fiscal Note, S.B. 96, at 1 (Feb. 19, 1987), *in* Bill File to S.B. 96, 1987 Leg., 397th Sess. (Md. 1987) (hereinafter "1987 S.B. 96 Bill File"). The Senate Judicial Proceedings Committee described the legislative intent of the 1987 Act:

> LEGISLATIVE INTENT:
>
> The legislative intent of Senate Bill 96 is to create the Maryland Homeowners Association Act which will govern contracts of sale for lots in a development that is subject to a homeowners association.

Senate Jud. Procs. Comm., Summary of Committee Report, at 2 (1987), *in* 1987 S.B. 96 Bill File.

In addition to the legislature's intent to ensure notice to purchasers that their potential purchase was within a homeowners association, the General Assembly followed the recommendation from the Governor's Commission that intentionally "decided not to include organizations that impose only covenants on homeowners, such as architectural restrictions, because the requirements of the law would be too burdensome to such groups." Governor's Comm'n, Final Report – 1985 Legislative Session, at 10.

The Senate Judicial Proceedings Committee made this distinction clear when it described the Act's definitions and scope in the Bill Analysis:

Section 11B-101

This subsection is definitional. The bill applies only to those developments which are subject to the authority of a homeowners association as conferred by an instrument in the land records office of the county where the development is located.

Senate Jud. Procs. Comm., Bill Analysis, at 2 (1987), *in* 1987 S.B. 96 Bill File.

The description of this section demonstrates that the intent was to subject to the HOA Act only those housing developments with recorded instruments that created the authority for a homeowners association. Its reference to "only those developments which are subject to the authority of a homeowners association" conveys that there are other housing developments that are not considered homeowners associations and are not subject to the Act.

Another document in the bill file confirms this distinction. The bill file contains a typewritten document titled "Maryland Homeowners Association Act (HOA)" with a handwritten note ascribing the source of the information to "Tom Filbert" with the Secretary of State's Office. Maryland Homeowners Association Act (HOA), at 1 (hereinafter "Filbert Document"), *in* 1987 S.B. 96 Bill File.[10] Thomas F. Filbert was the

---

[10] We cite several documents bearing on legislative intent to support our reasoning in this case. We take the opportunity presented by this appeal to note that "not all legislative history has equal value[.]" Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 437 (1995). The legislative sources and documents in a bill file that are most authoritative in

Staff Counsel for the Governor's Commission and served as the Executive Legal Assistant to the Secretary of State. Governor's Comm'n, Final Report – 1986 Legislative Session, at 16. As such, his work product conveys the understanding of the Governor's Commission to the General Assembly.

The Filbert Document explains:

1. Not all Homeowners Associations are governed by this Act.

---

any given appeal will vary, depending on the issues presented, but we offer now some general principles shared by Schwartz and Conn with which we agree.

"General Assembly documents most likely to reflect actual legislative purpose" are "fiscal notes, committee bill analyses, and floor reports." *Id.* at 462. Where work groups such as those referenced in this appeal result in proposed legislation, their sources can be invaluable in determining legislative intent. *Id.* at 440–41. Similarly, sponsor testimony can be helpful in identifying the purpose of legislation. *Id.* at 451. When requested, advice from Counsel to the General Assembly can shed light on legislative intent. *Id.* at 443. Finally, testimony or material provided by people or organizations at committee hearings are generally advocacy statements that may have a more limited purpose. *See id.* at 446. However, such testimony is useful when it addresses controversial provisions in the legislation and thus provides insights on amendments offered during the legislative process.

Here, we rely on the committee bill analysis and the committee report of the Senate Judicial Proceedings Committee as the best indicator of the legislature's intent because they were prepared by committee staff as the work on the bill proceeded in the committee. Because the HOA Act was passed in 1987, the fiscal note provides only a short summary of the bill indicating "no effect" on state or local revenues and expenditures (the modern practice of an expanded Fiscal and Policy Note for each bill began in 2002). While these notes provide a broad summary and background regarding the proposed bill, they are prepared by Department of Legislative Services staff and sometimes miss the detail and nuances that the committee staff provides in the committee bill analysis and floor reports. Fortunately, the background for the HOA Act is well-documented in the reports and materials from the Governor's Commission on Condominiums, Cooperatives and Homeowners Associations and the Task Force on Common Ownership Communities. In addition, the Filbert Document provides well-grounded authority for the intent of the Governor's Commission because Mr. Filbert served as the commission's counsel.

2. Only those Associations in which the governing document gives the Association the authority to impose on lots, or on the owners of lots, or on another Homeowners Association, Condominium or cooperative, a <u>mandatory fee</u> in connection with the provision of services for the benefit of the owners, their lots or the common areas f[a]ll within the purview of this Act.

Filbert Document, at 2. This description further illustrates that there are housing developments that are not subject to the HOA—some which may even refer to themselves as homeowners associations.[11]

Similar care was taken by the legislature in distinguishing those developments with a mandatory fee authorized by its declaration and those with shared pro rata maintenance obligations. Not only do the above legislative sources signify that a homeowners association is a form of entity or organization, they also emphasize that the Act only applies where the homeowners associations are authorized to impose a mandatory fee. Further, the Filbert Document highlights that a mandatory fee is a charge "in connection with the

---

[11] For example, a case out of Michigan involving a challenge to standing recognized that some associations have voluntary membership and act on behalf of their members. *Civic Ass'n of Hammond Lake Estates v. Hammond Lake Estates No. 3 Lots 126-135*, 721 N.W.2d 801, 804 (Mich. Ct. App. 2006); *see also White Lake Imp. Ass'n v. City of Whitehall*, 177 N.W.2d 473, 475 (Mich. Ct. App. 1970) (describing nature of nonprofit membership corporation). Our decision in *White v. Pines Community Improvement Association, Inc.* acknowledged the same. 173 Md. App. 13, 30 (2007); *accord White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 23 (2008); Cynthia Hitt Kent, *Governing Document Issues*, *in* Developing and Managing Condominium and Homeowners' Associations 51, 52 (National Business Institute July 2007) ("[T]here are many associations in existence that will use the name Civic association or Improvement association that are not Maryland Homeowner[s] Associations under [the HOA Act] because they do not impose **mandatory fees.** They are in fact voluntary associations/membership associations that persons are free to join or not join as they may desire.").

41

provision of services for the benefit of the owners, their lots or the common areas[.]" *Id.*; *see also* Governor's Comm'n, Final Report – 1985 Legislative Session, at 10 (describing fees and assessments as being "for the provision of services to lots or common areas").

In the case of Captains Quarters, the 1978 Declaration contained covenants, including architectural restrictions, as well as a pro rata contribution to common use improvements on an as-needed basis. The 1978 Declaration did not, however, create a homeowners association nor did it authorize a mandatory fee. This legislative history supports our analysis that the 1978 Declaration does not provide the authority to impose a mandatory fee, as required by RP § 11B-101(d)(1). Indeed, when it comes to pro rata contributions on common use maintenance obligations, "the law is clear—the cost of maintenance should be distributed among all users in proportions that closely approximate their usage." *Drolsum v. Luzuriaga*, 93 Md. App. 1, 22 (1992). The cost-sharing arrangement memorialized in the 1978 Declaration is only a restatement of this clear principle of law and does not rise to the level of "create[ing] the authority for a homeowners association to impose . . . a[] mandatory fee[.]" RP § 11B-101(d)(1). The legislative history likewise confirms the conclusion that not every declaration with covenants controlling exterior design has an implied or *de jure* homeowners association.

### E.    *Declarations and Developments Without a Homeowners Association*

The legislative history of the Act and case law support a distinction between developments that have a declaration but no homeowners association and those that are governed by a homeowners association. Not every declaration with covenants controlling exterior design has an implied or *de jure* homeowners association. Thus, contrary to the

42

circuit court's decision, the declaration applying to Captains Quarters did not create a community to be governed by a homeowners association, but rather a development subject to certain covenants.

In practice, it appears that many developments with a small number of lots were created through a declaration of recorded covenants and restrictions without the additional provisions to create a homeowners association. Roger Winston, one of the chief drafters of the Act, gave a presentation for the Maryland Institute for Continuing Professional Education for Lawyers ("MICPEL") in 1986—just prior to the passage of the 1987 bill. Mr. Winston listed the pros and cons for establishing a homeowners association and outlined various options, drafting considerations, and special conditions. Roger D. Winston, *supra*, at 204.

Mr. Winston first noted that a "homeowners association is a legal entity which can hold title to property." *Id.* Next, he acknowledged that "architectural control/use restrictions [] can be achieved through covenants without [a] homeowners association[.]" *Id.* He continued by addressing alternatives to an HOA including "covenants enforced by owners or others" with the recommendation to "[c]onsider this alternative if [the following warrant it:] no common area, small development or governmental restrictions on homeowners association[.]" *Id.* at 205; *accord* Sherri Heyman, *Creating a Condominium Regime/Homeowner's Association*, *in* Legal Aspects of Condominium Development and Homeowners' Associations 13, 14 (Nat'l Bus. Inst. Nov. 2006) (listing "No Official Governing Regime – Declaration of Restrictive Covenants" as a type of governance available for developers).

43

The development practice of building communities subject to restrictive covenants but not a homeowners association was recognized prior to the passage of the HOA Act. The legislative history recognizes this distinction. Furthermore, nothing in the legislative history suggests that the General Assembly expected that enacting the Act would eliminate the ability to build communities subject to restrictive covenants and automatically convert such community into ones governed by homeowners associations.

This is consistent with how our appellate courts have treated residential developments in our caselaw. Our Courts have not had many occasions to interpret the HOA Act,[12] but we have addressed both developments subject to a homeowners association and developments with restrictive covenants but no homeowners association.

Our Supreme Court described developments with a homeowners association in *Andrews & Lawrence Professional Services, LLC v. Mills*:

> Under the Maryland Homeowners Association Act, lots within the community are subject to a declaration, which is enforceable by the governing body of the [homeowners] association, as well as other governing

---

[12] The Supreme Court first decided a case involving the HOA Act in 1993. *See Dumont Oaks Cmty. Ass'n, Inc. v. Montgomery County*, 333 Md. 202, 203–04 (1993) (examining whether a county code violated the HOA and Condominium Acts). Since then, the Court has had occasion to interpret the HOA Act only a handful of times. *See Lipitz v. Hurwitz*, 435 Md. 273, 275 (2013) (interpreting the meaning of "member of the public" in the Act); *Steele v. Diamond Farm Homes Corp.*, 464 Md. 364, 378–79 (2019) (considering the HOA's definition of "declaration"); *Goshen Run Homeowners Ass'n, Inc. v. Cisneros*, 467 Md. 74, 79–80 (2020) (involving the collection methods available to homeowners associations to address delinquency); *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 132 (2020) (dealing with debt collection practices); *Nagle & Zaller, P.C. v. Delegall*, 480 Md. 274, 281 (2022) (answering a certified question regarding debt collection activities).

44

documents, such as its bylaws, and rules and regulations promulgated and adopted in accordance with the declaration and other governing documents.

467 Md. 126, 134 (2020).

In another case involving a homeowners association, the Supreme Court provided this description:

> The Goshen Run Village subdivision ("Goshen Run") is a residential community located in Montgomery County, Maryland. In December 1983, the developer of Goshen Run recorded a Declaration of Covenants & Restrictions ("Declaration") in the land records of Montgomery County, which imposed certain covenants and restrictions upon the lots and conferred certain privileges and obligations upon the lot owners within the subdivision.
>
> *       *       *
>
> The Goshen Run Homeowners Association ("Association") was established as the governing body to carry out the powers and duties set forth in the Declaration.

*Goshen Run Homeowners Ass'n, Inc. v. Cisneros*, 467 Md. 74, 80–81 (2020).

The Court has also said that "[t]he HOA Act applies to real property lots in a development community that are subject to a declaration of a [homeowners association.]" *Nagle & Zaller, P.C. v. Delegall*, 480 Md. 274, 286 (2022). Further, a homeowners association "is governed by its governing body in accordance with its declaration[.]" *Id.* (footnotes omitted).

Likewise, the Supreme Court described the proper form for the creation of a homeowners association: "In 1969, the [homeowners association] recorded its Declaration, establishing a homeowners association for a number of single-family homes in Gaithersburg, Maryland." *Steele v. Diamond Farm Homes Corp.*, 464 Md. 364, 369

45

(2019). It also explained that a declaration "operates to establish the capacity of an [a]ssociation" and "prescribes its capacity and certain powers[.]" *Id.* at 379.

Thus, our Supreme Court has consistently opined that formation of homeowners associations requires a declaration or other instrument or governing document that expressly creates the entity that operates as a homeowners association. There is no caselaw in Maryland that supports the concept that every declaration of restrictive covenants provides to an individual homeowner a *de jure* or implied right to create a homeowners association. A community governed by a declaration with common use and maintenance obligations is not what is typically referred to as a common ownership community. *See White*, 173 Md. App. at 67 ("The fact that those sharing a common easement may be responsible for its maintenance does not make the several landowners a common-interest community . . . .").

## F.    *The 2021 Declaration and the Application of RP § 11B-116*

The circuit court determined that RP § 11B-116 allowed owners of five of the eight units in Captains Quarters (62.5% of units) to amend the 1978 Declaration. While RP § 11B-116 allows a homeowners association to amend a "governing document" with 60% approval by lot owners in good standing, we disagree with the analysis of the circuit court in reaching this conclusion. We will explain.

The circuit court determined that the 1978 Declaration was a "declaration" under the Act, and thus qualified as a "governing document." A "governing document" is defined under RP § 11B-116 to include "(i) [a] declaration; (ii) [b]ylaws; (iii) [a] deed and agreement; and (iv) [r]ecorded covenants and restrictions." RP § 11B-116(a). While the

46

1978 Declaration refers to itself as a "declaration," we have concluded in our previous analysis that the 1978 Declaration was not a "declaration" under the Act.

By its own terms, the HOA Act applies only to homeowners associations. RP § 11B-102(a) ("Except as expressly provided in this title, the provisions of this title apply to all homeowners associations that exist in the State after July 1, 1987). In addition, by its plain language, RP § 11B-116(c) under which Dietz purported to amend the 1978 Declaration, applies to "a homeowners association":

> (c) Notwithstanding the provisions of a governing document, a *homeowners association* may amend the governing document by the affirmative vote of lot owners in good standing having at least 60% of the votes in the development, or by a lower percentage if required in the governing document.

RP § 11B-116(c) (emphasis added.)

Clearly, RP § 11B-116 itself only authorizes a "homeowners association"—not individual unit owners—to amend a governing document with 60% approval. As we have explained, the definition of "homeowners association" has remained the same since the initial consideration of the HOA Act. *Compare* S.B. 475, 1986 Leg., 396th Sess. (Md. 1986), *with* Md. Code (1974, 2015 Repl. Vol.) RP § 11B-101(i). We presume that the legislature's use of this defined term was intentional, making the amendment power under RP § 11B-116 available only to those organizations that fit the definition of a "homeowners association" in RP § 11B-101(i). As we have explained, the unit owners in Captains Quarters do not fit this definition. Thus, by the plain language of RP § 11B-116, the unit owners could not take advantage of RP § 11B-116 to amend the 1978 Declaration with 60% approval.

47

The broader statutory context supports this interpretation. The legislature's inclusion of RP § 11B-116 in the statutory scheme of the HOA Act indicates that it is not available to housing developments that do not qualify as a homeowners association. The legislature could have, but did not, place the provision or a corresponding provision in a section of the Real Property Article that applies more generally to property owners rather than specifically to homeowners associations.

For example, when the General Assembly decided to address property restrictions based on race, religious belief, or national origin, it created one provision under the HOA Act and another in a different section of the Article. In 2004, the legislature passed a bill allowing a homeowners association to "delete a recorded covenant or restriction that restricts ownership based on race, religious belief, or national origin from the deeds or other declaration of property in the development" if a certain percentage of owners agreed. 2004 Md. Laws ch. 478, RP § 11B-113.1(b).[13] In 2018, the legislature revised this provision to *require* that homeowners associations delete such restriction even without approval from owners. 2018 Md. Laws ch. 636, RP § 11B-113.3(b).

In the same 2018 legislation, the legislature created a new section in Article 3 of the Real Property Article allowing landowners—other than those within a homeowners association—to modify a recorded covenant or restriction based on race, religious belief,

---

[13] The session law indicated that it was to be codified at RP § 11B-113.1. However, Chapter 286 from the same session stated that it was to be codified at RP §§ 11B-113.1– 113.2. 2004 Md. Laws ch. 286. As a result, the provision for removing restrictions based on race, religious belief, and national origin was ultimately renumbered by the code publisher at RP § 11B-113.3.

or national origin that applied to their land. *Id.*, RP § 3-112(c). The section specifically noted that it did "not apply to an unlawfully restrictive covenant that is part of a declaration, uniform general scheme, or plan of development of a homeowners association as defined in § 11B-101 of [the HOA Act,]" *id.*, RP § 3-112(b), because the legislature had separately addressed such covenants in homeowners associations in RP § 11B-113.3. Thus, the legislature addressed racially restrictive covenants by amending one article that applied only to communities governed by a homeowners association and another that applied more generally to landowners.

The legislature's actions in this context indicate that it draws a distinction between those recorded covenants and restrictions that are part of the governing documents of a homeowners association development and those that are not. In the case of RP § 11B-116, the legislature has not chosen to enact a similar section outside of the HOA Act that would allow owners of homes not subject to a homeowners association to amend a document that subjects their properties to certain restrictive covenants. This indicates that the General Assembly intended the ability to amend certain documents under § 11B-116 to be available only when a development is governed by a homeowners association.

Additionally, nothing in the legislative history indicates that the General Assembly intended the provision to be available when a community without a homeowners association sought to amend its declaration to create one. The legislature added the current RP § 11B-116 to the HOA Act in 2008 at the recommendation of the Task Force on

49

Common Ownership Communities. 2008 Md. Laws ch. 145.[14] In its purpose paragraph, the legislation read,

> FOR the purpose of authorizing the governing documents of certain homeowners associations to be amended by a certain percentage of votes and at a certain frequency unless the governing document provides for a lower percentage and a greater frequency, defining a certain term; and generally relating to amendment of the governing documents of a homeowners association.

*Id.* As passed in 2008, the legislation allowed "a homeowners association created before January 1, 1960, [to] amend the governing document . . . by the affirmative vote of lot owners having at least two-third of the votes in the development, or by a lower percentage if required in the governing document." 2008 Md. Laws ch. 145, RP § 11B-116(b).

The idea for the legislation emerged from similar bills which had been introduced but failed in the 2006 session. H.B. 808, S.B. 779, 2006 Leg., 421st Sess. (Md. 2006). The

---

[14] Chapters 144 and 145, which arose from identical bills that had been cross-filed during the 2008 legislative session, were both signed into law.

> When two bills are cross-filed in the General Assembly and both pass in the House of Delegates and the Senate, the Governor has the choice to sign only one bill or both. Traditionally, it has been good legislative practice to only sign one bill. This is done for several reasons, such as to not clutter the chapter laws with redundancy, to preserve resources of staff time and printing (the printed Laws of Maryland for each legislative session would be almost double in size, print, and paper due to the large number of cross-filed bills), and to avoid legal confusion if, during the bill drafting and amendment process, the two bills end up being not truly identical word-for-word. The only reason to sign both involves the pride of the primary sponsors who each want the benefit of having the Governor sign their bill. When both cross-filed bills are signed by the Governor in succession, the first bill is superseded by the second bill.

*Wheeling v. Selene Fin.*, 473 Md. 356, 405 n.2 (2021) (Getty, J. concurring and dissenting). Thus, Chapter 145 superseded Chapter 144 when it was signed into law.

2006 legislation would have "authorize[d] a homeowners association . . . to amend its declaration, bylaws, or deed of agreement with less than a unanimous vote if: (1) its governing body and its lot owners determine it is necessary; and (2) 80% of the lots owners agree to the amendment." Dep't of Leg. Servs., Fiscal and Policy Note, H.B. 808, at 1, 2006 Leg., 421st Sess. (Md. 2006), *in* Bill File to H.B. 808, 2006 Leg., 421st Sess. (Md. 2006) (hereinafter "2006 H.B. 808 Bill File").

The motivation for the 2006 legislation initially came from one homeowners association—the Chatham Homeowners Association. One of the Delegates sponsoring the legislation explained in his testimony that "[t]he Chatham Homeowners Association was originally established by a Deed and Agreement in 1938. This Deed and Agreement required unanimous approval for any changes to be made." Testimony of Delegate Samuel I. Rosenberg Before the House Environmental Matters Committee (Feb. 23, 2006), *in* 2006 H.B. 808 Bill File. The Delegate and the homeowners association both explained that the association had been unable to procure unanimous approval to make needed changes. *Id.*; Letter of Support from Chatham Building and Maintenance Committee, Inc., *in* 2006 H.B. 808 Bill File. Although Chatham served as the initial impetus for the legislation, the association noted that it "ha[d] been contacted positively by other older homeowners associations with similar concerns about their own outdated covenants and no real ability to bring about change in neighborhood covenants 'which run with the land.'" Letter of Support from Chatham Building and Maintenance Committee, Inc. Despite amendments that would have limited the legislation to apply only to Chatham and no other

51

neighborhoods in Maryland, *see* Testimony of Delegate Samuel I. Rosenberg, the legislation did not pass.

The year before the 2006 legislation was introduced, the General Assembly had created the Task Force on Common Ownership Communities to study, in part, "issues facing aging common ownership communities[,]" which the legislature defined to mean condominiums under RP § 11-101, *et seq.*, cooperative housing corporations under Md. Code Corp. & Ass'n § 5-6B-01, *et seq.*, and homeowners associations under the HOA Act. 2005 Md. Laws ch. 469. The Task Force was still meeting and had not yet issued its final report when the 2006 legislation was introduced. The failed 2006 legislation was referred to the Task Force to consider "what the appropriate threshold should be for a homeowners association to amend its declaration, bylaws, and deed of agreement[.]" *See* Letter from Senator Brian Frosh to Task Force on Common Ownership Communities (July 5, 2006), *in* Bill File to S.B. 779, 2006 Leg., 421st Sess. (Md. 2006).

The Task Force considered the issue. In its December 2006 Final Report, it suggested that "Maryland law should be amended to allow any [common ownership community] to change its governing documents at least once every five years unless allowed more often under the governing documents, overriding any language in the governing documents to the contrary" and that "[u]nless current law requires a higher percentage, any changes to a [common ownership community's] governing documents should require the approval of not more than 66-2/3% of the owners (or such lower percentage as may be set forth in the governing documents)." Task Force on Common Ownership Cmtys., 2006 Final Report, at 21 (Dec. 31, 2006).

The Task Force explained this recommendation:

> Many older HOAs are severely restricted in how often they may change their governing documents and/or in the percentage of unit owners required to approve such changes. The requirement of unanimous or near unanimous consent has proven burdensome. A bill was introduced in the 2006 session of the General Assembly to permit HOAs to amend their governing documents if the governing board and 80% of the residents approve the amendment. The General Assembly deferred action on the bill, and asked that the Task Force consider the issue.

> The Task Force recommends that a law be passed to permit every [common ownership community] to amend its governing documents at least once every five years, and to require approval of any amendment by the affirmative vote of not more than 66-2/3% of all unit owners (or such lesser majority of all unit owners as may be provided for in the [common ownership community's] governing documents). To the extent that existing [common ownership community's] governing documents provide for less frequent amendment and/or a higher majority to approve amendments, the new law should override such provisions. However, to the extent that current statutes require unanimous consent to certain amendments (such as changes in unit boundaries or in the percentage interest charged or allocated to any given unit), or approval of more than 66-2/3%, those statutory requirements of unanimity or of a super-majority vote should continue in effect.

*Id.*

The Task Force's recommendation resulted in cross-filed bills in the 2008 legislative session—House Bill 1129 and Senate Bill 101. Dep't Leg. Servs., Fiscal and Policy Note, Revised, H.B. 1129, at 1–2, 2008 Leg., 425th Sess. (Md. 2008). The bills "authorize[d] a governing document of a homeowners association to be amended at least once every five years, unless a greater frequency is allowed by the governing document, by the affirmative vote of lot owners having at least two-thirds of the votes in the development, or a lower percentage if required in the governing document." *Id.* at 1. It also defined governing document to "include[] [a] declaration; [b]ylaws; [a] deed and

53

agreement; and [r]ecorded covenants and restrictions." 2008 Md. Laws ch. 145, RP § 11B-116(a). The legislation was limited to those homeowners associations which were "created before January 1, 1960." 2008 Md. Laws ch. 145, RP § 11B-116(b). Because of the limitation to pre-1960 associations, "[t]he bill would allow older communities with homeowners associations, such as Chatham in Baltimore, to amend their governing documents more frequently but would not apply to newer communities such as Columbia."[15] Dep't Leg. Servs., Fiscal and Policy Note, Revised, S.B. 101, at 1, 2008 Leg., 425th Sess. (Md. 2008). The bills passed and were enrolled as Chapters 144 and 145 of the 2008 Laws of Maryland.

In its final form, the legislation created a new § 11B-116 in the HOA Act and provided that "[n]otwithstanding the provisions of a governing document, a homeowners association created before January 1, 1960, may amend the governing document once every 5 years, or more frequently if allowed by the governing document, by the affirmative vote of lot owners having at least two-thirds of the votes in the development, or by a lower percentage if required in the governing document." 2008 Md. Laws. ch. 145, RP § 11B-116(b).

---

[15] According to its website, the "Columbia Association (CA) is a nonprofit community services corporation that manages Columbia, MD, home to approximately 100,000 people." *About Us*, Columbia Association, https://columbiaassociation.org/about-us/ [https://perma.cc/A2AE-AC83] (last visited July 18, 2023). The website dedicates a page to the division of responsibility between CA, the Howard County Government, and the ten village associations throughout Columbia. *Who Handles What?*, Columbia Association, https://columbiaassociation.org/about-us/who-handles-what/ [https://perma.cc/RQX8-3TG7] (last visited July 18, 2023).

Section 11B-116 was then amended in 2017. 2017 Md. Laws ch. 480. The amendments removed the restriction that the law only applied to homeowners associations created before January 1, 1960, lowered the threshold for amending a governing document from two-thirds to 60%, and required that the votes be of lot owners in good standing, as defined by the new law. *Id.*, RP § 11B-116(c). They also specifically exempted "a homeowners association that issues bonds or other long-term debt secured in whole or in part by annual charges assessed in accordance with a declaration, or to a village community association affiliated with the homeowners association[,]" *id.* § 11B-116(b), thereby continuing to exempt its provisions from applying to the Columbia Association. Senate Jud. Procs. Comm., Floor Report, at 1 (2017), *in* Bill File to H.B. 789, 2017 Leg., 437th Sess. (Md. 2017).

As it stands now, RP § 11B-116(c) reads, "Notwithstanding the provisions of a governing document, a homeowners association may amend the governing document by the affirmative vote of lot owners in good standing having at least 60% of the votes in the development, or by a lower percentage if required in the governing document."

In sum, the plain language indicates that RP § 11B-116 is only available to organizations that qualify as a "homeowners association." Nothing within the statutory context or the legislative history indicates that the General Assembly intended the term to mean something different than its definition under RP § 11B-101(i). Accordingly, since the unit owners within Captains Quarters are not a "homeowners association" under the HOA Act, they could not rely upon RP § 11B-116 to amend the 1978 Declaration to create a homeowners association and retroactively approve alterations made to Dietz's unit.

55

The circuit court concluded that the 2021 Declaration governed the dispute between Dietz and Logan. We disagree and conclude that the 2021 Declaration is not valid and thus not enforceable. The 2021 Declaration relied on RP § 11B-116 for the authority to create a homeowners association with only five of the eight units concurring in amendment to the 1978 Declaration. Having explained that, without a homeowners association in Captains Quarters, this section of the HOA Act did not allow this amendment, we conclude that the amendment to create a homeowners association was not valid.

Prior to the enactment of RP § 11B-116, if a declaration did not address how it could be amended, "the right to amend by less than 100% of the [o]wners & mortgagees . . . [would] not be implied." Cynthia Hitt Kent, *Governing Document Issues*, *in* Developing and Managing Condominium and Homeowners' Associations 51, 61 (Nat'l Bus. Inst. July 2007). This unanimity requirement is the "same as [the] initial adoption of restrictive covenants." *Id.*

The 1978 Declaration did not provide procedures for its amendment. Absent such a provision, the requirement of unanimous consent to amend is implied. This is reasonable given that the other covenants in the 1978 Declaration required unanimous approval of the unit owners in the community—i.e., unanimous consent for alterations to the building's exterior. The owners of three of the eight units within Captains Quarters did not join in the 2021 Declaration. Thus, the 2021 Declaration is not valid as an amendment to the 1978 Declaration.

The creation of a mandatory homeowners association that has the authority to assess fees on homeowners within the community affects the owners' interest in their property.

56

*Cf. Norris v. Williams*, 189 Md. 73, 76 (1947) ("[R]estriction upon the use of land are in derogation of the natural right which an owner possesses to use and enjoy his property[.]"). It involves a restriction on the property—subjecting it to a homeowners association—and an affirmative covenant to support the association financially. Restrictive covenants are both property interests and contracts. *Burns v. Scottish Dev. Co., Inc.*, 141 Md. App. 679, 694–95 (2001). A restrictive covenant can be either personal—between the original covenanting parties—or can run with the land—binding the successors in title to the original covenanting parties. *See Cnty. Comm'rs of Charles Cnty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 446 (2001).

Since the unit owners within Captains Quarters could not rely on RP § 11B-116 and could not otherwise amend the 1978 Declaration with less than unanimous consent of the owners, we conclude that the circuit court erred in ruling that the 2021 Declaration governed the present dispute. The 1978 Declaration remains the controlling document governing Captains Quarters and the owners, but we make no judgment on any arguments the parties may raise on remand about the 1978 Declaration's continued enforceability.

### G. Summary – Captains Quarters & the HOA Act

Our foregoing discussion compels us to conclude that the 1978 Declaration for Captains Quarters does not have a *de jure* or implied right to form a homeowners association under the HOA Act. As we have explained, we will vacate the circuit court grant of summary judgment in Dietz's favor and remand for further proceedings.

The 1978 Declaration did not establish or provide the authority to create homeowners association in the community. This lack of reference is inconsistent with the

57

initial purpose of the HOA Act which was to provide disclosure to buyers that their home would be subject to a homeowners association. Additionally, the 1978 Declaration precedes the passage of the HOA Act in 1987. The Act itself did not create homeowners associations where they did not previously exist. Instead, subject to certain exceptions, its "provisions . . . appl[ied] to all homeowners associations that exist in the State after July 1, 1987." RP § 11B-102(a). This indicates that the Act governs those homeowners associations which were created prior to the Act but continued to exist after its effective date and those that were created after the Act's effective date. Nothing in the Act indicates that the Act created a homeowners association where one did not exist beforehand.

As we have discussed, for Dietz and the other homeowners to rely on § 11B-116 of the Act, there had to be a qualifying homeowners association, which in turn required a qualifying declaration. Neither of these exists in Captains Quarters. The 1978 Declaration did not create a governing body that could enforce the declaration's provisions. Contrary to the ruling of the circuit court, a homeowner cannot individually be a "homeowners association." Allowing someone in their individual capacity, rather than in a representative capacity, to be considered a "homeowners association" is illogical. The Act requires that the homeowners association be an entity or organization that has the power to govern the development by enforcing covenants and restrictions—or a representative of such entity.

Likewise, the developer who originally subjected Captains Quarters to a declaration did not create a homeowners association in the original 1978 Declaration, and, accordingly, there is no entity empowered to enforce the 1978 Declaration. Only the unit owners can enforce it against each other.

Furthermore, the 1978 Declaration does not meet the statutory definition of a "declaration" under the Act, which contributes to the conclusion that there was no homeowners association in Captains Quarters. The 1978 Declaration does not provide for the imposition of a mandatory fee. Rather, the declaration provides for a cost-sharing arrangement among neighbors when joint expenses arise. There is no authority for an entity to assess mandatory fees against the lots, the owners, or people who occupy the lots. Thus, the 1978 Declaration does not satisfy the definition under the statute, and there can be no homeowners association without a qualifying declaration to be enforced.

Unlike the Condominium Act, there is no statutory process within the HOA Act whereby a community without a homeowners association could create one. Property owners may subject their properties to a homeowners association as they would any other restrictive covenant, but—as an alienation of a property right—each owner must agree to subject his or her property to the association with the consent of any holder of a security interest in the property. *See Boyd v. Park Realty Corp.*, 137 Md. 36, 39 (1920) ("[The owner], which purchased [the property] subject to the mortgage, could not place restrictions on the property which would be binding on the mortgagees without their consent or unless they were in some way estopped from questioning them.").

Maryland appellate courts "provide[] judicial deference to the policy decisions enacted into law by the General Assembly." *Johnson*, 467 Md. at 371 (quoting *Blackstone*, 461 Md. at 113). If the General Assembly desires that communities without a homeowners association be able to create one and become subject to the HOA Act in a different manner, it should create such a process statutorily—keeping in mind that due process protections

59

be afforded to property owners. *See Moore v. RealPage Util. Mgmt, Inc.*, 476 Md. 501, 532 (2021) (citing *In re S.K.*, 466 Md. at 57–58) (suggesting that, if policy considerations merit a different interpretation, the General Assembly pass new legislation to that effect).

Since there is no homeowners association under the HOA Act in Captains Quarters, Dietz and the other parties to the 2021 Declaration could not rely on § 11B-116 of the Act to amend the declaration with 60% approval of unit owners. Accordingly, we vacate the judgment of the Circuit Court for Worcester County granting Dietz's motion for summary judgment and remand to that court for further proceedings consistent with this opinion. On remand, the circuit court should consider the continued enforceability of the 1978 Declaration based on any other arguments the parties raise.

## CONCLUSION

We conclude that the 1978 Declaration did not provide the authority to create a homeowners association nor did it provide for a mandatory fee for the unit owners of Captains Quarters. The plain language of the statute and the legislative history support this conclusion and do not support a finding of an implied or *de jure* homeowners association. Accordingly, the HOA Act does not apply to the Captain Quarters Townhouses, and Dietz and other owners could not take advantage of § 11B-116 of the Act to amend the 1978 Declaration. Thus, we vacate the circuit court's orders granting summary judgment in

favor of Dietz and dismissing Logan's complaint. We remand this case for further proceedings to determine the continued enforceability of the 1978 Declaration.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY— OPINION AND ORDER DATED OCTOBER 19, 2021, AND MEMORANDUM ORDER DATED DECEMBER 16, 2021—VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES WESLEY J. DIETZ; JOHN MCKINLEY AND JANIS M. RYAN AS TRUSTEES OF THE JANIS M. RYAN REVOCABLE TRUST; DAVID VESTAL AND MEGAN PARK; AND JOHN AND PATRICIA OWENS.**